**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

SAMUEL LOUIS-CHARLES,

                    Plaintiff,

           v.                                                      No. 9:16-CV-1417
                                                                        (MAD/CFH)
CORRECTIONS SERGEANT BAKER,
CORRECTIONS SERGEANT NEWTOWN,
CORRECTIONS OFFICER MACILVENNIE,
CORRECTIONS OFFICER FRANK
SEYMORE, CORRECTIONS OFFICER
PATTERSON,

                    Defendants.

_____

**APPEARANCES:**                                    **OF COUNSEL:**

Samuel Louis-Charles
16-B-2202
Marcy Correctional Facility
P.O. Box 3600
Marcy, New York 13403
Plaintiff pro se

Menter, Rudin & Trivelpiece, P.C.              TERESA M. BENNET, ESQ.
Syracuse Office                                MITCHELL J. KATZ, ESQ.
308 Maltbie Street
Syracuse, New York 13204-1498
Attorneys for Defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

Plaintiff <u>pro se</u> Samuel Louis-Charles ("plaintiff"), who at the relevant time in question was a pretrial detainee at the Jefferson County Correctional Facility ("JCCF"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants Corrections Sergeant ("Sgt.") Jonathan Barker, Sgt. Robert Newtown, Corrections Officer ("C.O.") Shaun Macilvennie, C.O. Frank Seymour, and C.O. Jeff Patterson – who, at all relevant times, were employed at JCCF – violated his constitutional rights under the Fourteenth Amendment.  <u>See</u> Dkt. No. 1 ("Compl."). Presently pending before the Court is defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 50. Plaintiff opposed defendants' motion, and defendants filed a reply. Dkt. Nos. 67, 68. For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

### A. Plaintiff's Recitation of the Facts

### 1. Statement of Facts Set Forth in the Complaint

The facts are related herein in the light most favorable to plaintiff as the nonmoving party.  <u>See</u> subsection II.A. <u>infra</u>.  Plaintiff alleges that on July 27, 2016,[2] an unnamed corrections officer removed him from the recreation yard "where some type of altercation had

---

[1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[2] Plaintiff's complaint states that the incident occurred on July 26, 2016.  Compl. at 3.  However, he later testified this was in error, and the incident occurred on July 27, 2016.  Dkt. No. 50-6 at 10.

taken place." Compl. at 3. Defendants escorted plaintiff to the booking room, where they stripped him and "proceeded to assault him." Id. Defendants stated that plaintiff violated contraband rules and "tried to insinuate that [p]laintiff had swallowed some type of contraband. Id. at 3-4. Sgt. Barker[3] "grabbed a hold on plaintiff's right wrist and proceeded to bend it in an unnatural manner; the pain was excruciating, while the other defendants continued to assault plaintiff." Id. at 3. Defendants placed plaintiff in a "strip cell" to await his defecation to monitor for the alleged contraband. Id. at 4. No contraband was found, and disciplinary charges against plaintiff were dropped. Id. at 4.

On October 7, 2016, "[p]laintiff became aware of the extent of the injuries he suffered due to the actions of" defendants. Compl. at 4. Plaintiff's primary care physician at Collins Correctional Facility ordered a neurological consultation. Id. The neurologist conducted electrodiagnostic testing, as well as a physical examination, and found that plaintiff suffered from "server [sic] right medial neuropathy at the wrist (right) (sever [sic] right carpal tunnel syndrome), only in his right wrist, which can only be caused by some type of extreme trauma to the effected wrist." Id.

### 2. Response to Interrogatories

In response to defendants' interrogatories, plaintiff claims that he "does not recall any excessive use of force prior to entering the booking area. Dkt. No. 50-4 at 3. He claims that Sgt. Newtown "made a statement that plaintiff was acting suspicious." Id. at 4. He contends

---

[3] Plaintiff incorrectly refers to Sgt. Barker as Sgt. Baker.

that "Newtown, Macilvennie, [and] Patterson assaulted plaintiff while he lay prostrated upon the ground before and after Barker had placed handcuffs on [him], kicking, punching[,] and cursing plaintiff." Id. at 3. Plaintiff claims that Barker "immediately struck plaintiff on the right side of plaintiff's head with his fist, knocking plaintiff to the floor." Id. Sgt. Barker then twisted "plaintiff's right arm into an arm bar movement grabbing plaintiff's right wrist in a [hammer] lock movement[.]" Id. He contends that "Newtown stepped on [his] left ankle while kicking him in the left hand side of plaintiff's upper body, while he lay face down upon the [ground] of the booking area shower floor." Id. Plaintiff also claims that Sgt. Newtown was "screaming about plaintiff's having filed a lawsuit against him upon an incident between Newtown and plaintiff." Id. Plaintiff alleges that C.O. Patterson "was also kicking plaintiff," and that Macilvennie "was punching plaintiff in the head and neck." Id. at 3-4. He also contends that C.O. Seymour "entered the booking area while the assault was taking place and did nothing to intervene." Id. at 3.


### 3. Plaintiff's Deposition Testimony

At his deposition, plaintiff testified that C.O. Macilvennie "rammed [him] into the wall and called him a "troublemaker" as the officers escorted plaintiff to the booking area. Dkt. No. 50-6 ("Pl. Dep.") at 13. In recounting the alleged incident, plaintiff testified that Sgt. Newtown only "kneed [him] [on his left side] when he was on the ground." Id. at 17. As to Sgt. Barker, plaintiff testified that while he was laying on the ground, Sgt. Barker stood on his hand. Id. at 20. As to C.O. Macilvennie, plaintiff testified that he was standing when C.O. Macilvennie hit

him on the right side of his head. Id. at 16. Plaintiff also testified that C.O. Macilvennie did not speak to him or otherwise make a comment during the alleged assault. Id. at 53. As to C.O. Patterson, plaintiff testified that C.O. Patterson was "[j]ust watching the situation" and "standing by the door on the left-hand side entrance." Id. at 18. However, in his revision to his deposition testimony, plaintiff contends that C.O. Patterson "was joining in" the alleged assault, and that only C.O. Seymour watched. Dkt. No. 50-8 at 2. As to C.O. Seymour, plaintiff testified that C.O. Seymour was present for the entire incident, and standing "by the door on the left-hand side entrance." Pl. Dep. at 18-19. Moreover, plaintiff testified that C.O. Seymour did not touch or speak to him during the assault. Id. at 19, 38

## B. Defendants' Recitation of the Facts

In support of their motion, defendants have filed a Statement of Material Facts.[4]  On

---

[4] Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically

July 23, 2016, plaintiff was booked into the custody of Jefferson County Correction's Department on charges of assault with intent to cause physical injury with a deadly weapon, criminal possession of a weapon in the third, and menacing in the second degree with a weapon. Dkt. No. 50-26 ¶¶ 7, 8. Plaintiff also had prior arrests for drug-related offenses. Id. ¶ 9. On his admission to JCCF, plaintiff received a copy of the Rule Book, which contained the rules and regulations of the JCCF. Id. ¶ 10. On July 23, 2016, plaintiff was involved in a fight with another inmate. Id. ¶ 11. During the altercation, plaintiff and the other inmate failed to comply with direct orders, and had to be pepper sprayed. Id. ¶ 12. As a result of the fight, plaintiff was placed on administrative segregation, but was permitted recreation time. Id. ¶ 13.

On July 27, 2016, non-party C.O. Cordova observed plaintiff strike another inmate in the head during recreation. Dkt. No. 50-26 ¶¶ 14, 15. C.O. Cordova called for "rovers,"[5] and ordered plaintiff to lay on the ground. Id. ¶¶ 17, 18. Plaintiff complied, and hand restraints were applied. Id. ¶ 18. Sgt. Barker and C.O. Macilvennie responded to C.O. Cordova's call, and escorted plaintiff to Intake – i.e., the booking area. Id. ¶¶ 19, 20. Sgt. Newtown, non-party C.O. Moore, and non-party C.O. Elmer also responded to the rover call, and followed Sgt. Barker and C.O. Macilvennie to Intake. Id. ¶ 21. Once they arrived at Intake, Sgt. Barker led plaintiff to the back shower/strip room to search him for contraband. Id. ¶ 22. Sgt. Barker and

_____

controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

[5] Defendants do not provide a definition of "rovers."

C.O. Macilvennie removed plaintiff's hand restraints, and instructed plaintiff to begin taking off his clothes. Id. ¶ 23. Plaintiff removed his jumpsuit, as well as his shirt and underwear, and handed each piece of clothing to C.O. Macilvennie. Id. ¶ 24. Plaintiff then turned toward Sgt. Barker so that he was perpendicular to the wall, and reached down to his left sock and manipulated it as though he was attempting to remove something. Id. ¶ 25. Sgt. Newton stated that plaintiff had put something into his mouth, and instructed the officers to get plaintiff off of his feet. Id. ¶¶ 26, 27. Plaintiff was assisted to the ground. Id. ¶ 28. Sgt. Barker, C.O. Macilvennie, C.O. Seymour, and C.O. Patterson did not speak to plaintiff during the alleged assault. Id. ¶ 29.      After the incident, plaintiff was given a pair of boxer shorts, and a nurse evaluated plaintiff's medical condition. Dkt. No. 50-26 ¶¶ 30, 31. Plaintiff complained of pain in his right wrist, and the nurse offered him an ice pack. Id. ¶ 32. Although plaintiff had a small cut on the right side of his head, plaintiff stated that the injury was from the July 23, 2016 altercation. Id. ¶ 33. Plaintiff did not claim to suffer any other injuries as a result of the July 27, 2016 incident.   Id. ¶ 34.  On July 28, 2016, plaintiff received a Notice of Administrative Segregation and Misbehavior Report, as well as incident reports filed by each of the officers involved. Id. ¶ 35. Plaintiff was released from the holding cell on the same day that he signed the Notice. Id. ¶ 36. Plaintiff left the custody of the JCCF on August 4, 2016. Id. ¶ 41.

## II. Discussion[6]

## A. Legal Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. See id. "When no rational jury could find in favor of the non-moving party because the evidence to

---

[6] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." <u>Gallo v. Prudential Services, Ltd. P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a <u>pro se</u> litigant, a court must afford the non-movant special solicitude. <u>See Triestman v. Fed. Bureau of Prisons</u>, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a <u>pro se</u> litigant is entitled to "special solicitude," . . . that a <u>pro se</u> litigant's submissions must be construed "liberally," . . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . . At the same time, our cases have also indicated that we cannot read into <u>pro se</u> submissions claims that are not "consistent" with the <u>pro se</u> litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by <u>pro se</u> litigants," . . . and that <u>pro se</u> status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

<u>Id.</u> (citations and footnote omitted); <u>see also Sealed Plaintiff v. Sealed Defendant</u>, 537 F.3d 185, 191-92 (2d Cir. 2008).

## B. Exhaustion

Defendants contend that plaintiff's complaint must be dismissed because he failed to exhaust his administrative remedies. <u>See</u> Dkt. No. 50-25 ("Def. Mem. of Law") at 15-25. Specifically, defendants contend that (1) plaintiff's alleged verbal grievances do not satisfy the requirement of proper exhaustion; (2) plaintiff's "protest" to the sheriff and deputy sheriff do not constitute proper exhaustion; and (3) plaintiff's failure to exhaust cannot be excused. <u>See id.</u>

In his complaint, plaintiff alleged that he "was never afforded the opportunity to grieve the assault . . . while in the custody of the Jefferson County Sheriff's office" because "[t]he deputies within the facility refused to except [sic] any form of grievance filed by plaintiff or protest he wrote to the Sheriff and Deputy Sheriff of Jefferson County regarding the assault[.]" Compl. at 6. In his response to discovery demands plaintiff claimed that "Newtown refused to accept [his] grievance concerning the incidents that lead to this complaint," and that he "verbally appealed to [Barker] because Newtown would not accept [his] grievance." Dkt. No. 50-4 at 5. Plaintiff also contended that he handed a written grievance to C.O. Newtown, but that he "never received any reply." Dkt. No. 50-5 at 2. Plaintiff testified at his deposition that he verbally requested a grievance form from Sgt. Barker and C.O. Newtown. Pl. Dep. at 60, 64. Plaintiff testified that Sgt. Barker questioned "for what," and C.O. Newtown did not respond to his request. Id. at 61, 64. Plaintiff thereafter amended his deposition testimony to state that it was a verbal grievance "because there [were] no grievance sheets in the cell blocks and the CO's don't issue them without the [sergeant's] permission and they denied me." Dkt. No. 50-8 at 2. In opposition, plaintiff argues that it was "impossible" for him to exhaust his administrative remedies because he did not have access to paper, pen or pencil, writing pad, reading material, personal mail, or stamps while he was held in the strip cell. Dkt. No. 67-2 ("Pl. Opp.") at 8.

The Prison Litigation Reform Act ("PLRA") requires that an individual exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524 (2002); see also

Woodford v. Ngo, 548 U.S. 81, 82 (2006); Baez v. Parks, No. 02-5821, 2004 WL 1052779, at *5 (S.D.N.Y. May 11, 2004) (citation omitted) ("[T]he PLRA's strict exhaustion requirement does indeed apply in actions brought by pretrial detainees."). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Id. at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, __ U.S. __,136 S. Ct. 1850, 1862 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 680 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).[7]

Although Ross eliminates the "special circumstances" exception, courts must still

---

[7] In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829 F.3d at 123. The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing Ross, 136 S. Ct. at 1858-59).

consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

### 1. Did Plaintiff Exhaust his Administrative Remedies?

At the JCCF, the inmate grievance process is initiated by addressing the issue with the Housing Unit Officer. Dkt. No. 50-12 ("Wilson Aff.") ¶ 14; Dkt. No. 50-20 at 24. If an inmate is unable to resolve the issue with the Housing Unit Officer, the inmate must address the situation with the Shift Supervisor, who will talk with the inmate to see if they can reach an informal resolution. Id.; Dkt. No. 50-20 at 24. If the issue cannot be resolved, the inmate must request and file a formal grievance. Id.; Dkt. No. 50-20 at 24. The written grievance is investigated by the Grievance Coordinator, who is required to make a written determination within five business days. Id. ¶ 16; Dkt. No. 50-20 at 24. If the inmate is dissatisfied with the

12

result, he or she must file an appeal of the determination to the Facility Administrator within two business days, who is required to render a determination within five business days of receipt of the appeal.  Id.; Dkt. No. 50-20 at 24.  If dissatisfied, an appeal must be taken with the Citizen's Policy and Complaint Review Council ("CPCRC").  Id.; Dkt. No. 50-20 at 24. The inmate grievance process is explained in the Rule Book distributed to every inmate on admission to JCCF.  Id. ¶ 12.

The undersigned finds that the record demonstrates that plaintiff did not exhaust the three steps of the available procedure.  Assistant Facility Administrator Lieutenant ("Lt.") Mark Wilson states that he has reviewed the JCCF grievance records and failed to find "any record of a written grievance filed by [p]laintiff in connection with the July 27, 2016 incident."  Wilson Aff. ¶ 20.  Plaintiff testified that he did not file a written grievance associated with the July 27, 2016 incident.  Pl. Dep. at 62.  Insofar as plaintiff contends that he "protest[ed]" the defendants' conduct in letters written to the Jefferson County Sheriff and Deputy Sheriff, these letters do not constitute proper exhaustion.  It is well-settled in this Circuit that a plaintiff's letters to prison or other officials outside the grievance chain of command are insufficient to properly exhaust administrative remedies.  See Geer v. Chapman, No. 9:15-CV-952 (GLS/ATB), 2016 WL 6091699, at *5 (N.D.N.Y. Sept. 26, 2016), report and recommendation adopted, 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016) (citing Macias v. Zenk, 495 F.3d 37, 44-45 (2d Cir. 2007) ("It is well-settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies.").  Thus, to the extent that plaintiff

did send "protests" to the Jefferson County Sheriff and Deputy Sheriff,[8] these letters are insufficient to constitute proper exhaustion.  As plaintiff has not provided evidence of exhaustion, the undersigned concludes that plaintiff has failed to demonstrate that he properly exhausted his administrative remedies.

## 2. Availability of Administrative Remedies

Plaintiff offers varying arguments suggesting that the grievance process was unavailable to him at JCCF, and, therefore, he should be excused from the exhaustion requirement.  As an initial matter, the undersigned agrees with the arguments defendants set forth in their motion and reply papers as to whether administrative remedies were unavailable.  Much of case law plaintiff cites to in his opposition predates the enactment of the PLRA, which superseded a law that made exhaustion "in large part discretionary."  Dkt. No. 68-3 ("Def. Reply") at 15.  Further, to the extent that plaintiff relies on estoppel or the special circumstances exception to render administrative remedies unavailable, the Second Circuit has held that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate."  Williams, 829 F.3d at 123 (citing Ross, 136 S. Ct. at 1858-59).  Thus, insofar as plaintiff suggests that defendants estopped him from properly exhausting his administrative remedies or that special circumstances exist to excuse the requirement, these arguments are misplaced.

---

[8] Plaintiff has not proffered evidence of such letters.

14

Even if the undersigned accepts plaintiff's claim that Sgt. Barker and Sgt. Newtown denied his requests for a grievance form, see Pl. Dep. at 60-61, the record is clear that plaintiff did not request a form from one of the other four Shift Supervisors on duty from July 27, 2016 to August 4, 2016. See id. at 61 (testifying that he did not reach out to another Shift Supervisory after Sgt. Barker allegedly denied his request for a formal grievance); Wilson Aff. ¶ 17 (noting the Shift Supervisors on duty from July 27, 2016 to August 4 2016). Plaintiff's testimony that he did not ask another officer for a grievance form because he thought Sgt. Barker or Sgt. Newman would be "man enough to give [him] a grievance" and that he "wanted it to come directly from" the officers involved in the incident does not render the grievance process unavailable.

To the extent that plaintiff contends that he did not reach out to another officer because he was "going out" — i.e., transferred from county jail to the upstate prison system, Pl. Dep. at 61 — this impending transfer did not deprive him of a meaningful opportunity to access the grievance program. See Hartry v. Cnty. of Suffolk, 755 F. Supp. 2d 422, 433-34 (E.D.N.Y. 2010). The regulation governing New York State county-run facilities states that "[a]n inmate must file a grievance within five days of the act or occurrence giving rise to the grievance." N.Y. COMP. CODES. R. & REGS tit. 9, § 7032.4(d). Plaintiff transferred out of JCCF on August 4, 2016. Pl. Dep. at 61. Even assuming that plaintiff was held in a "dry cell"[9] for two days without access to writing materials,[10] plaintiff remained at JCCF for five days before his

---

[9] Plaintiff does not describe what constitutes a "dry cell."

[10] Plaintiff does not allege that he requested writing materials while in the dry cell.

transfer.  Thus, plaintiff had sufficient time to file a grievance at JCCF regarding the July 27, 2016 incident prior to his transfer.  See Flowers v. City of New York (DOCS), 668 F. Supp. 2d 574, 578 (S.D.N.Y. 2009) ("Yet transfer from City to State custody does not obviate the inmate's duty to exhaust his administrative remedies by complying with the City Department of Correction's Inmate Grievance Resolution Program . . . at least where an inmate has sufficient time to pursue administrative remedies in the facility where the incident complained of took place."); Miles v. Cnty. of Broome, No. 3:04-CV-1147, 2006 WL 561247, at *6 (N.D.N.Y. Mar. 6, 2006) (concluding that the plaintiff failed to exhaust his administrative remedies where the he "should have filed a grievance within five days of the accrual of his gripe" and "was not transferred out of the BCCF until after he had the opportunity to file a grievance."); cf. Hartry, 755 F. Supp. 2d at 433 (concluding that the plaintiff did not have a meaningful opportunity to avail himself of the grievance process where the inmate handbook permitted an inmate to file a grievance within five days, and the plaintiff transferred out of the facility within two days).

Further, plaintiff's conclusory allegations that there were no grievance forms in the cell blocks, and that corrections officers are not permitted to issue grievance forms absent permission from a sergeant are insufficient to render the grievance process unavailable. See Dkt. No. 50-8 at 2.  As defendants argue, "plaintiff has not introduced evidence that grievance forms were unavailable throughout [JCCF]," Def. Mem. of Law at 21 (quoting Angulo v. Nassau County, 89 F. Supp. 3d 541, 551 (E.D.N.Y. 2015), nor has plaintiff specified who informed him that there were no grievances in the cell block or that corrections officers were

16

not permitted to issue the forms absent supervisor approval, or when these statements were made.  Although plaintiff is offered special solicitude, he "must still establish the existence of genuine issues of material fact to survive a motion for summary judgment; the pro se party's 'bald assertion,' when unsupported by evidence, is insufficient." Shariff v. Poole, 689 F. Supp. 2d 470, 476 (W.D.N.Y. 2010) (citing Lee v. Coughlin, 902 F. Supp. 424, 429 (S.D.N.Y. 1995)). Thus, as plaintiff has failed to proffer evidence supporting his allegations, they are insufficient to create a genuine issue of material fact.

Moreover, plaintiff has failed to demonstrate that defendants "thwart[ed] inmates from taking advantage of a grievance process[.]" Ross, 136 S. Ct. at 1860. Plaintiff claims that the defendants "didn't want [him] to exhaust his remedies because of their retaliation in false reports of smuggling of contraband." Pl. Opp. at 8.  However, as defendants point out, plaintiff misinterprets the case law in how retaliation and exhaustion intersect;[11] instead, it has been held that "specific *threats* of retaliation or intimidation by prison officials may render administrative remedies unavailable." Grafton v. Hesse, No. CV 15-4790 (SJF) (GRB), 2017 WL 9487092, at *7 (E.D.N.Y. Aug. 25, 2017) (citation omitted) (emphasis added).[12]  Plaintiff

---

[11] To the extent that plaintiff may seek to allege a retaliation claim against defendants, it must be denied as "it is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion." Thomas v. Egan, 1 F. App'x 52, 54 (2d Cir. 2001) (summary order) (citing Beckman v. United States Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000)); see Jones v. Goord, 435 F. Supp. 2d 221, 261 (S.D.N.Y. 2006) (same).

[12] Plaintiff also seems to suggest that defendants conspired to make false allegations against him. See Pl. Opp. at 11.  To the extent that plaintiff may seek to allege a conspiracy claim against defendants, it must be denied for the same reasons as stated in footnote 10.  Nevertheless, plaintiff's conclusory allegations against defendants fail to establish a prima facie conspiracy claim — i.e., "an agreement between two or more defendants to act in concert to inflict an unconstitutional injury, and an overt act done in furtherance of that goal causing damages." McCloud v. Prack, 55 F. Supp. 3d 478, 482 (W.D.N.Y. 2014) (citation omitted).  There is no indication in the record that defendants agreed to act in concert to retaliate

has not alleged that defendants threatened him with retaliation if he filed a grievance, or otherwise intimidated him to render the grievance procedure unavailable. Plaintiff's claims that defendants "isolated" him in the strip room to "render the [grievance process] unavailable," Pl. Opp. at 10, are belied by Lieutenant ("Lt.") Wilson's reply affidavit, wherein he states that "administrative segregation 'pending review' is routine when an inmate engages in a fight with another inmate," that plaintiff had previously been placed on such confinement four days prior after his initial fight with another inmate, and that plaintiff was still on such segregation when the second fight occurred on July 27, 2016. Dkt. No. 68 ("Wilson Reply Aff.") ¶ 3. Moreover, strip cell restriction is routine when an inmate may have been in possession of contraband. Id. ¶ 5. Lt. Wilson affirms that during such restriction, an inmate is not placed in "an isolation cell"; instead, the strip cell restriction is imposed in the housing unit at the cell assigned to the inmate, and they are permitted to keep legal materials, hygiene items, uniforms, and religious materials. Id. ¶ 7. An inmate may also interact with and have access to officers assigned to their housing unit. Id. ¶ 8. Plaintiff has not stated how defendants kept him in isolation, or described the conditions he faced while on strip cell restriction.

Insofar as plaintiff argues in opposition that he did not have a paper, writing utensil or stamps, therefore, "making it impossible for [him] to exhaust his remedies[,]" Pl. Opp. at 8, this argument contradicts plaintiff's earlier contention that handed Sgt. Barker a "written grievance," Dkt. No. 50-5 at 2, and that he drafted "protest" letters to the Jefferson County Sheriff and Deputy Sheriff, see Compl. at 6. "Plaintiff's internally inconsistent testimony,

---

against plaintiff. As "[c]onclusory allegations of a conspiracy will not suffice," id., plaintiff fails to set forth a conspiracy claim.

coupled with the lack of external record evidence supporting his argument that [the grievance process was unavailable to him at JCCF], is insufficient to create a genuine dispute of material fact regarding the availability of the formal grievance procedure." Gizewski v. New York State Dep't of Corr. and Comm. Superv., No. 9:14-CV-0124(GTS/DJS), 2016 WL 3661434, at *12 (N.D.N.Y. July 5, 2016) (citing Jeffreys v. City of New York, 426 F.3d 549, 555 (2d Cir. 2005) (explaining that district court could resolve issues of credibility on motion for summary judgment in narrow circumstances where [1] the testimony of non-movant is largely unsubstantiated by any other direct evidence, and [2] that testimony is so incomplete and/or replete with inconsistencies and improbabilities that, even after drawing all inferences in the light most favorable to the non-movant, no reasonable jury could find for the non-movant). Therefore, plaintiff has failed to establish that administrative remedies were unavailable to him.

Accordingly, as exhaustion is a prerequisite to filing an action in federal court (Woodford, 548 U.S. at 85), it is recommended that defendants' Motion for Summary Judgment be granted.


## C. Excessive Force Claims

The undersigned will now address the merits of the claim for the sake of completeness. Plaintiff contends that defendants subjected him to excessive force by "grab[bing] [his] right wrist in a hammer-lock type hold to the point of causing [p]laintiff extreme pain." Compl. at 4-5. Pretrial detainees, like other inmates, enjoy protection against the use of excessive force and

may recover damages for its violation under § 1983. Hudson v. McMillian, 503 U.S. 1, 9-10 (1992). The Fourteenth Amendment due process clause protects pretrial detainees from "the use of excessive force that amounts to punishment." Kingsley v. Hendrickson, ___ U.S. ___, 135 S.Ct 2466, 2473 (2015) (citing Graham v. Connor, 490 U.S. 386, 395 n.10 (1989)). To bring a claim of excessive force under section 1983, "a pretrial detainee must only show that the force purposely or knowingly used against him was objectively unreasonable to prevail on an excessive force claim." Kingsley, 135 S.Ct 2466, 2473. "[I]f the use of force is deliberate – i.e., purposeful and knowing-the pretrial detainee's claim may proceed." Id. In applying this standard, a Court must "make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. (quoting Graham, 490 U.S. at 396). Further "a court must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." Id. at 2476. Thus, a pretrial detainee can make a showing if the force "was taken with an 'expressed intent to punish" or "by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental purpose or that it is excessive in relation to that purpose." Id. at 2473-74 (citing Block v. Rutherford, 468 U.S. 576, 585-86 (1984) (additional citation omitted)). Despite the fact that

> objective reasonableness depends on the facts and circumstances of each case, courts may consider a number of factors, including: The relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to

20

> temper or to limit the amount of force; the severity
> of the security problem at issue; the threat
> reasonably perceived by the officer; and whether
> the plaintiff was actively resisting.

Musaid v. Manka, 13-CV-7880 (PKC) (MHD), 2016 WL 540806, at *3 (S.D.N.Y. Feb. 9, 2016)

(quoting Kingsley, 135 S.Ct. at 2473).

The undersigned finds that, after a review of the record, plaintiff contends that Sgt.

Barker, C.O. Macilvennie, and Sgt. Newtown took part in the use of force, while C.O.

Patterson and C.O. Seymour failed to intervene.  See Pl. Dep. 20, 23-24; Pl. Op. at 3.  Thus,

the undersigned must consider whether Sgt. Barker, C.O. Macilvennie, and Sgt. Newtown's

use of force against plaintiff was objectively unreasonable.  Defendants offer affidavits from

Sgt. Barker and Sgt. Newtown regarding the July 27, 2016 incident.  See Dkt. No. 50-10

("Barker Aff."); Dkt. No. 50-9 ("Newtown Aff.").  As such, Sgt. Barker, Sgt. Newtown, and

plaintiff offer contradictory recitations of the facts. Sgt. Barker claims that he observed plaintiff

transfer an object from his sock to his mouth that plaintiff later admitted was "bud." Barker Aff.

¶¶ 5, 9.  Sgt. Barker attempted to prevent plaintiff from swallowing the objected by taking

control of his jaw area, and ordering plaintiff to spit the object out.  Id. ¶ 6.  Plaintiff refused,

and resisted Sgt. Barker's attempts to control his head by turning his head toward the wall.

Id.  Sgt. Barker assisted plaintiff to the floor, and continued to order him to spit out the object

and stop resisting. Id. ¶ 7.  Plaintiff ignored Sgt. Barker's orders.  Id.  Sgt. Newtown attempted

to secure plaintiff's left arm; however, plaintiff struck Sgt. Barker in the stomach and/or rib

area.  Id. ¶ 8.  Sgt. Barker struck plaintiff in the facial region with his right knee, and plaintiff

relaxed his arm and offered less resistance.  Id.  Sgt. Barker used his right thumb to re-apply

21

pressure to plaintiff's mandibular pressure point to maintain control of his head. Id. Plaintiff admitted that he swallowed the object, and Sgt. Barker released his hold on plaintiff's head and secured him in restraints. Id. ¶ 9. Sgt. Barker escorted plaintiff to a holding cell using a "transport wrist lock" on his right wrist, but did not apply pressure as plaintiff was not resisting at that time. Id. ¶ 10.

Sgt. Newtown claims that he observed plaintiff "manipulating" his sock "more than necessary" during the strip search, and observed plaintiff "attempt to remove some type of contraband" from his sock. Newtown Aff. ¶ 7. Sgt. Newtown witnessed plaintiff resist officers' attempts to prevent him from swallowing the contraband, and attempted to gain control of plaintiff's left arm. Id. ¶ 8. He informed the other officers that they "need[ed] to get [plaintiff] off his feet." Id. As Sgt. Newtown "had a hold of [p]laintiff's left arm," he "went to the ground with him." Id. Once on the floor, Sgt. Newtown ordered plaintiff to "give [them] his hands." Id. ¶ 9. Sgt. Newtown placed his right knee on plaintiff's left common peroneal area, and applied pressure to gain control of plaintiff's hand to apply handcuffs. Id.

Conversely, plaintiff maintains that he did not have contraband on his person, and denies resisting officers to precipitate the use of force. See Pl. Dep. at 25, 33. Plaintiff denies that defendants assisted him to the ground, and argues that he was "forcefully tackled or slammed . . . to the ground." Dkt. No. 67 ¶ 28. Moreover, there is some medical evidence supporting plaintiff's claims of nerve damage in his hand. See Dkt. No. 67-3 at 22, 26.

Although the Kingsley Court established that the use of force must be judged "from the perspective of a reasonable officer on the scene, including what the officer knew at that time,"

Kingsley, 135 S.Ct. at 2473, the undersigned acknowledges that this the competing evidence rests on credibility determinations of the parties, which must be reserved for the trier of fact, see In re Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence, functions which are reserved to the trier of fact) (citing cases). The undersigned cannot conclude that no rational jury could find in favor of plaintiff, and, thus, summary judgment is inappropriate at this time. See Jordan v. Fischer, 773 F. Supp. 2d 255, 272-73 (N.D.N.Y. 2011) (citing cases for the proposition that summary judgment is inappropriate on the plaintiff's excessive force claim where the plaintiff's claim turns on issues of credibility).

Accordingly, should the district court judge disagree with the undersigned's recommendation for dismissal as to plaintiff's failure to exhaust, it is recommended that defendants' motion for summary judgment be denied.[13]

## 1. Qualified Immunity

Defendants contend that their use of force during the July 27, 2016 incident are protected by qualified immunity. See Def. Mem. of Law at 25-30. Defendants argue that (1) the use of the wrist lock has been repeatedly held appropriate to restore order and obtain compliance; (2) the use of force was necessitated to prevent plaintiff from swallowing

_____

[13] Defendants do not proffer an affidavit from C.O. Macilvennie, but the record is clear that he was present in the intake and took part in the use of force. See generally Barker Aff. (describing C.O. Macilvennie's involvement in the use of force); Newtown Aff. (same); Dkt. No. 50-19 (detailing C.O. Macilvennie's incident report).

contraband; and (3) even if the force was excessive, defendants are entitled to qualified immunity. See id. Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. See Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. See Aiken v. Nixon, 236 F. Supp. 2d 211, 230 (N.D.N.Y. 2002).

It is well-settled that on July 27, 2016, the Fourteenth Amendment prohibited law enforcement officers from using excessive force against pretrial detainees. See, e.g., Toliver v. City of New York, 530 F. App'x 90, 92 n.1 (2d Cir 2013); Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009). Defendants proffer a series of cases stating that "bar-hammer take down" – a move similar to one used on plaintiff – has been repeatedly held appropriate to restore order and obtain compliance; thus, they argue that such move is protected by pre-existing law.

24

<u>See</u> Def. Mem. of Law at 27-28.  However, these cases reference the plaintiff's "aggressive, confrontational manner," <u>Ellis v. Chambers</u>, No. 11-5146, 2012 WL 2449868, at *9 (W.D. Ark. May 25, 2012), and "disruptive behavior," <u>Wilson v. Stallard</u>, No. 7:10-CV-00237, 2010 WL 3291798, *8 (W.D. Va. Aug. 19, 2010).  Whether plaintiff acted in an aggressive or disruptive manner is a disputed issue of material fact that cannot be decided on a motion for summary judgment.  <u>See</u> Part II.C., <u>supra</u>.  Thus, in assessing whether defendants are entitled to qualified immunity, the same disputed issue of fact exists to determine to whether the "bar hammer wrist lock" is protected under pre-existing law in this case. <u>See</u> <u>Wilson v. Calderon</u>, No. 14 Civ. 6209 (GBD) (GWG), 2017 WL 2881153, at *9 (S.D.N.Y. July 6, 2017) ("These same disputed facts also make summary judgment on the issue of qualified immunity inappropriate.").

Still, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights," defendants may still be protected under qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." <u>Kaminsky</u>, 929 F.2d at 925.  Although Sgt. Barker contends that (1) he is a defensive tactics instructor at JCCF; (2) was aware of the wrist manipulation maneuvers; and (3) knew that these maneuvers were authorized by the New York State Commission of Corrections, Barker Aff. ¶ 16, the record indicates that these techniques are used to "gain control of a resisting inmate." Wilson Aff. ¶ 23.  As there is a dispute as to whether plaintiff was resisting at the time of the July 27, 2016 incident, summary judgment is inappropriate.

Accordingly, as defendants are not entitled to qualified immunity, it is recommended that defendants' motion be denied.

### D. Failure to Intervene Claim

Defendants contend that plaintiff's failure to intervene claims against C.O. Seymour and C.O. Patterson must be dismissed.

> In order to establish liability on the part of a defendant under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration: (1) possessed actual knowledge of the use by another corrections officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force.

Lewis v. Mollette, 752 F. Supp. 2d 233, 244 (N.D.N.Y. 2010) (internal citation and quotation marks omitted).

Despite his varying narratives, plaintiff claims that, at some point during the July 27, 2016 incident, C.O. Seymour and C.O. Patterson entered the booking area, and watched the other officers' use of force. Pl. Dep. at 18-19, 38-39. In support of their motion, defendants proffer the affidavit of C.O. Patterson. C.O. Patterson states that, in his role as a Classification Officer at JCCF, it is not his responsibility to respond to rover calls; if such call is made, his duty to is relieve the responding officer assigned to the main hall so that officer can respond to the call. Dkt. No. 50-11 ("Patterson Aff.") ¶ 2. Thus, C.O. Patterson states that he was not present in the intake room on July 27, 2016. Id. ¶ 3. The incident reports from July

26

27, 2016 do not cite C.O. Patterson as a staff member involved in the incident, and C.O.

Patterson is only mentioned to the extent that he "came out to the main hall from his office so

that [C.O. Desormo] could respond to the rover call." Dkt. No. 50-19 at 3, 5; Dkt. No. 67-3 at

16. The undersigned finds that plaintiff has failed to produce evidence, aside from his

conclusory allegations, creating a genuine dispute as to whether C.O. Patterson was in the

booking area. Thus, it is recommended that defendants' motion as to plaintiff's failure to

intervene claim against C.O. Patterson be granted.

As to C.O. Seymour, aside from plaintiff's allegations that C.O. Seymour was present

in the booking area during the July 27, 2016, see Dkt. No. 50-4 at 3, 50-8 at 2, Pl. Dep. at 18-

19, the record is silent as to C.O. Seymour's involvement in the incident. Defendants do not

proffer an affidavit from C.O. Seymour. Further, neither the incident reports concerning the

July 27, 2016 incident, nor Sgt. Barker and Sgt. Newtown's affidavits describing the incident,

reference C.O. Seymour's involvement. See Dkt. No. 50-19; Barker Aff.; Newtown Aff.

However, assessing the facts in the light most favorable to plaintiff as the nonmoving party, the

undersigned finds that defendants have not met their burden of showing the absence of a

disputed material fact as to whether C.O. Seymour was involved in the July 27, 2016 incident.

Cf. Johnson v. Brown, No. 9:09-CV-0002 (GTS/DEP), 2011 WL 1097864, at *7 (N.D.N.Y.

Mar. 22, 2011) (granting the defendants' motion for summary judgment where plaintiff's

"internally contradictory and incomplete deposition testimony" that the defendant subjected

him to excessive force was contradicted by the defendants' admissible record evidence, in

the form of an affidavit and subsequent time sheets establishing that the defendants were not

working and/or did not see the plaintiff on the night in question). Thus, absent admissible record evidence establishing that C.O. Seymour was not involved in the July 27, 2016 incident, the undersigned recommends that defendants' motion on this ground be denied.

### III. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for summary judgment (Dkt. No. 50) be **GRANTED** on the grounds that plaintiff failed to exhaust his administrative remedies. Alternatively, if reached, defendants' motion for summary judgment should be **GRANTED** as to plaintiff's failure to intervene claim against C.O. Patterson; **DENIED** as to his excessive force claims against Sgt. Barker, C.O. Macilvennie, and C.O. Newtown; and **DENIED** as to his failure to intervene claim against C.O. Seymour, and it is

**ORDERED**, that the Clerk of the Court update the docket to reflect the spelling used in this Report-Recommendation and Order: (1) Baker to Barker; (2) Seymore to Seymour;

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984

F.2d 85, 89 (2d Cir. 1993) (citing <u>Small v. Secretary of Health and Human Servs.</u>, 892 F.2d

15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[14]

Dated: July 27, 2018
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[14] If you are proceeding <u>pro se</u> and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. <u>Id.</u> § 6(a)(1)(C).